## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**JAGUAR LAND ROVER LIMITED,**
**a United Kingdom company,**

  *Plaintiff,*

v.

**BOMBARDIER RECREATIONAL**
**PRODUCTS, a Canadian company,**

  *Defendant.*

**Case No. 2:16-cv-13386-GAD-SDD**

**Hon. Gershwin A. Drain**

*JURY TRIAL REQUESTED*

# PLAINTIFF JAGUAR LAND ROVER'S MOTION FOR SUMMARY JUDGMENT



Plaintiff Jaguar Land Rover Limited ("Plaintiff" or "JLR"), by and through its undersigned counsel, moves pursuant to Federal Rule of Civil Procedure 56 for entry of summary judgment in favor of JLR on Counts I (Abandonment), Count II (Void *ab Initio*), and Count III (Fraud) of Defendant Bombardier Recreational Products' ("Defendant" or "BRP") First Amended Counterclaim (Dkt. No. 18).

The factual and legal bases for this motion are more fully explained in the accompanying brief.  Pursuant to Local Rule 7.1(a), JLR requested, but did not receive, concurrence from BRP in the relief sought in this motion.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

Dated:  July 16, 2018

/s/ Frank A. Angileri
Frank A. Angileri (P45611)
Chanille Carswell (P53754)
Rebecca J. Cantor (P76826)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel: (248) 358-4400 / Fax: (248) 358-3351
Email:  fangileri@brookskushman.com
        ccarswell@brookskushman.com
        rcantor@brookskushman.com

*Attorneys for Plaintiff, Jaguar Land Rover Limited*

1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**JAGUAR LAND ROVER LIMITED,**
**a United Kingdom company,**

      *Plaintiff,*

**v.**

**BOMBARDIER RECREATIONAL**
**PRODUCTS, a Canadian company,**

      *Defendant.*

**Case No. 2:16-cv-13386-GAD-SDD**

**Hon. Gershwin A. Drain**

*JURY TRIAL REQUESTED*

## PLAINTIFF JAGUAR LAND ROVER'S
## BRIEF IN SUPPORT OF ITS MOTION FOR
## SUMMARY JUDGMENT



## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.  INTRODUCTION ...................................................................................1

II. FACTUAL BACKGROUND.....................................................................2

    A.  History of JLR's DEFENDER Vehicle.............................................2

    B.  JLR's Use of DEFENDER In the U.S. ...........................................2

        1.  JLR's DEFENDER Sales 1992-1998 ...............................2

        2.  JLR Franchise Dealerships ...............................................3

        3.  JLR's DEFENDER Sales Post-1998 .................................5

        4.  JLR's Plans to Resume New Vehicle Sales to General Consumers...................................................................6

        5.  Sustained Enthusiasm for DEFENDER...................................8

    C.  JLR's Renewals of the DEFENDER Registration.............................9

        1.  The November 5, 1999 Renewal .............................10

        2.  The October 24, 2003 Renewal .............................10

        3.  The February 19, 2014 Renewal .............................11

III. ARGUMENT..................................................................................12

    A.  Legal Standard.............................................................12

    B.  Abandonment .............................................................12

        1.  JLR Never Ceased Using Its DEFENDER Mark ...................13

        2.  JLR Always Had an Intent to Resume Use of Its DEFENDER Mark ...................................................15



          3.     JLR has Residual Goodwill in the DEFENDER mark ............ 17

  C.    Fraud ................................................................................. 18

          1.     JLR Did Not Make a False, Material Misrepresentation ......... 19

          2.     JLR Did Not Intend to Defraud the PTO ................................ 20

          3.     The Specimens JLR Submitted to the PTO Do Not
                   Provide a Basis for Cancellation ............................................. 20

  D.    BRP's Void *Ab Initio* Claim Fails as a Matter of Law ...................... 22

IV.  CONCLUSION ................................................................................. 23



# TABLE OF AUTHORITIES

## Cases

*Adidas Am., Inc. v. Calmese*,
    2010 WL 4861444 (D. Ore. Nov. 19, 2010) ..................................................22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................12

*DC Comics v. Kryptonite Corp.*,
    336 F. Supp. 2d 324 (S.D.N.Y. 2004) ..........................................................14

*FDIC v. Homestead Mortg. Co.*,
    2010 U.S. Dist. LEXIS 136392 (E.D. Mich. Dec. 27, 2010) ............... 13, 15

*Ferrari S.p.A. Escercizio Fabbriche Automobili e Corse v. McBurnie*,
    1989 WL 298658 (S.D. Cal. June 1, 1989) ....................................................17

*Grocery Outlet Inc. v. Albertsons, Inc.*,
    2008 U.S. Dist. LEXIS 101999 (N.D. Cal. Dec. 17, 2008) .........................15

*In re Bose*,
    580 F. 3d 1240 (Fed. Cir. 2009) ........................................................... 18, 20

*KeyCorp. v. Key Bank & Trust*,
    99 F. Supp. 2d 814 (N.D. Ohio 2000) ..........................................................14

*Marshall Field & Co. v. Mrs. Fields Cookies*,
    1989 TTAB LEXIS 17 (TTAB March 7, 1989)..........................................21

*NetJets Inc. v. IntelliJet Grp., LLC*,
    2017 U.S. App. LEXIS 2062 (6th Cir. Feb. 3, 2017)...................................22

*Nolan LLC v. TDC International Corp.*,
    2008 WL 11355576 (E.D. Mich. Mar. 31, 2008)................................. 13, 14

*Skippy, Inc. v. CPC* Int'l, Inc.,
    674 F.2d 209 (4th Cir. 1982) ..........................................................................16



*Stilson & Assoc., Inc. v. Stilson Consulting Group, LLC*,
    2005 WL 1059277 (6th Cir. May 6, 2005)..................................................12

*Timm Med. Techs., Inc. v. SOMA Blue, Inc.*,
    2002 U.S. Dist. LEXIS 926 (D. Min. Jan. 15, 2002) ...................................14

## Statutes

15 U.S.C. §1058 ...........................................................................................9
15 U.S.C. §1064 .........................................................................................22
15 U.S.C. §1127 ..................................................................................... 12, 14

## Other Authorities

McCarthy on Trademarks § 17:15 .........................................................18



iv

# I.    INTRODUCTION

Since 1992, Plaintiff Jaguar Land Rover Limited ("JLR") has sold a sports utility vehicle called the DEFENDER in the U.S., as well as related goods and services. The DEFENDER is most well-known around the world for its superior off-road capabilities. JLR filed this trademark infringement action against Defendant Bombardier Recreational Products ("BRP") because BRP adopted the identical trademark in 2015 for an off-road vehicle (called a side-by-side), which BRP markets to the same type of customer. BRP responded with three counterclaims requesting cancellation of JLR's U.S. trademark registration: abandonment (Count I), invalid renewal, i.e., void *ab initio* (Count II), and fraud (Count III). All three counterclaims are predicated on BRP's claim that JLR has not sold DEFENDER vehicles in the U.S. since 1998.

In fact, JLR only stopped selling *new* DEFENDER vehicles to *general* consumers in 1998, due to changes in U.S. airbag laws. BRP does not and cannot dispute that JLR continued selling new DEFENDER vehicles in the U.S. to *commercial* customers, as well as pre-owned DEFENDER vehicles to general consumers. BRP also does not and cannot dispute that JLR continued manufacturing replacement parts for sale to general and commercial customers, and that JLR (via licensed dealerships) continued servicing DEFENDER vehicles.

Given these undisputed facts, among other things, BRP cannot prove a *prima facie* case of abandonment, void *ab initio*, or fraud. Therefore, JLR respectfully moves for summary judgment on BRP's Counterclaims.



## II.    FACTUAL BACKGROUND

### A.    History of JLR's DEFENDER Vehicle

The origins of the Land Rover DEFENDER date back to 1947, when then-chief designer (for a JLR predecessor), Maurice Wilks, drew the design for a utilitarian vehicle in the sand at his farm in Anglesey, Wales. By 1948, JLR[1] transformed Mr. Wilks's sand drawing into an actual, working vehicle that JLR showed at the Amsterdam Auto Show. Originally, these vehicles were called LAND ROVER or LAND ROVER SERIES vehicles. Around 1990, when JLR decided to introduce additional models under the Land Rover name, JLR renamed the original LAND ROVER vehicle the DEFENDER. Over the last 70 years, JLR has sold over 2 million SERIES and DEFENDER vehicles throughout the world. (Exh. A.) JLR also owns 179 DEFENDER trademark registrations and applications for various classes of goods throughout the world (not including registrations and applications for DEFENDER-formative marks[2]).  (Exh. B.)

### B.    JLR's Use of DEFENDER In the U.S.

#### 1.    JLR's DEFENDER Sales 1992-1998

JLR began selling the 1993 model year DEFENDER in the U.S. in 1992.  The first year, JLR imported 500 Alpine White Defender 110[3] vehicles into the U.S. for

---

[1] "JLR" hereinafter refers to both JLR and its predecessors in interest.

[2] "DEFENDER-formative marks" are trademarks that include other terms such as "DEFENDER DC 100" or "LAND ROVER DEFENDER."

[3] The number after the DEFENDER name refers to the length of the wheelbase. Thus, the DEFENDER 110 has a 110-inch wheelbase and the DEFENDER 90 has a 90-inch wheelbase.



2

sale.  JLR advertised these vehicles as the ultimate off-road vehicle—a vehicle that could go anywhere and do anything. (Exh. C.) These first vehicles were a hit almost immediately and continued to be popular through the 1997 model year last sold to general consumers in 1998.  In all, between 1992 and 1998, JLR imported and sold approximately 7,000 DEFENDER vehicles in the U.S.  (Exh. D.) On November 9, 1993, JLR obtained U.S. Trademark Registration No. 1,803,707 for "motor land vehicles; namely station wagons" in International Class 12 (the "'707 Registration"). (Exh. E.)  Many of these vehicles are still on the road today.

### 2.    JLR Franchise Dealerships

Like all vehicle manufacturers (including BRP), JLR sells its vehicles to end consumers through authorized dealerships located throughout the U.S. (hereinafter "JLR Franchise Dealerships").  Those dealerships operate under a franchise agreement that includes a license to use certain JLR trademarks, including the DEFENDER trademark:



(Exh. F at ¶2.7. (emphasis added).)[4] The franchise agreement also requires JLR's Franchise Dealerships to

> (*Id.* at ¶9.4.)  And they are specifically required to

(*Id.* at 21 (emphasis added).)

---

[4]  JLR has produced several versions of this franchise agreement for various times between 1993 and the present. All include a license to use the DEFENDER 90 and DEFENDER 110 marks.



### 3.    JLR's DEFENDER Sales Post-1998

Because JLR designed the DEFENDER as a utilitarian vehicle for off-road adventures, it had few, if any, "luxury" features.  For example, until the late 90s, DEFENDER vehicles had sliding windows—not automatic or crank windows.  Air conditioning was not standard on the DEFENDER, rather, it was an option.  And JLR made the DEFENDER interior out of materials that could be hosed off so that the vehicle could be easily cleaned after going through dirt, mud, and any other unsavory substances.

Among the features lacking from the DEFENDER were airbags.  At the end of 1998, a new federal regulation went into effect requiring that all passenger vehicles sold in the U.S. have driver and passenger side airbags. (Exh. G at 56:13-57:2.)  This forced JLR to stop selling new DEFENDER vehicles to general consumers in the U.S. in 1998. Given the popularity of the vehicle, however, JLR planned to bring a redesigned version back to general consumers in the U.S. and publicly stated as much. (Exh. H.)

In the interim, through its licensees and franchisees, JLR was still allowed to sell and did sell new vehicles to commercial customers[5] and pre-owned vehicles to general consumers. JLR's sales specifically included: (1) a fleet of thirteen 2000 and 2001 model year DEFENDER 110 vehicles to Busch Gardens in Florida in 2001 (Exhs. I, J); (2) over thirty vehicles to JLR licensee Rovers North (of Vermont), who in turn sold them to the U.S. military and U.S. defense contractors (Exhs. K at

---

[5] These sales were permitted because the commercial customers do not use the vehicles on public roads.



5

132:11-3, L-M, SS-TT); and (3) over 2,700 1993-1997 model year pre-owned DEFENDER vehicles from 1998 through 2018 by JLR's Franchise Dealerships (Exhs. D, N.)

JLR has also continued to sell vehicle-related and non-vehicle-related goods and services. Specifically, from 1992 to the present: (1) JLR consistently manufactured DEFENDER vehicle parts that JLR sells to general consumers through JLR Franchise Dealerships and other licensees, including Rovers North (Exhs. O-Q, WW);[6] (2) JLR's Franchise Dealerships performed warranty and non-warranty repairs and maintenance services on DEFENDER vehicles (Exhs. F, R); (3) JLR licensed several companies to make toy DEFENDER vehicles, ranging in size from small, die-cast models to larger, remote-control toy vehicles (Exh. S); and (4) JLR sold numerous DEFENDER novelty items, including but not limited to T-shirts, key chains, mugs, and toys (Exh. T).

### 4. JLR's Plans to Resume New Vehicle Sales to General Consumers

In 2000, just two years after the new airbag laws went into effect, Ford (then-owner of JLR) publicly stated its intention to bring new DEFENDER vehicles back to U.S. general consumers:

---

[6] Since at least the late 1990s, Rovers North has advertised DEFENDER replacement parts on its website (www.roversnorth.com) and in a quarterly magazine that Rovers North publishes and distributes by mail. (Exh. K, Letorney Dep. Tr. at 190:3-7; 191:21-25.) Rovers North informs JLR of all its marketing materials and JLR often provides assistance with the marketing content. (*Id*. at 192:13-21; 275:2-10, 15-16; 277:6-14.)



> **Ford Motor Co.'s Land Rover Defender** four-wheel-drive sport
> utility vehicle, a no-frills workhorse favored by farmers in Britain and
> United Nations peacekeepers in trouble spots, **will return to the U.S.
> in the next few years the company said**. . . . The Defender represents
> "the essence of the Land Rover brand," said Land Rover Chief
> Executive Bob Dover in a speech to journalists Monday. An all-new
> Defender would "open up huge international sales possibilities," he
> said.

(Ex. H, BRP5277) (emphasis added).[7] Since then, JLR has taken multiple steps

consistent with that plan.

For example, JLR has shown multiple DEFENDER concept vehicles in the

U.S. In October 2003, JLR transported and displayed a DEFENDER CKD at the

Specialty Equipment Market Association ("SEMA") show in Las Vegas, Nevada as

the Land Rover Defender 501 Concept.  (Exh. U; Mitrione Decl. at ¶17.) The

DEFENDER CKD or "complete knock-down" was a fully assembled kit version of

the DEFENDER vehicle.

In 2011, JLR transported and displayed another DEFENDER concept vehicle,

known as the DC100, at the Los Angeles Auto Show.  (Exhs. V, W, Mitrione Decl.

at ¶18.)  JLR described the DEFENDER DC100 as a prelude to "the next chapter in

the DEFENDER story." (Exh. V. at 2.) JLR also displayed the DEFENDER DC100

in 2012 at the New York Auto Show. (Exh. W.) Shortly thereafter, JLR publicly

announced that a redesign of the much-beloved, iconic DEFENDER body style was

underway and that JLR would sell the new vehicles in the U.S. (Exh. X.) JLR's

internal planning documents going back to at least 2012 confirm the same. (Exh. Y.)

---

[7] Ford purchased Land Rover from BMW in 2000, but later (in 2008) sold its
interest to the current owner, Tata Motors Ltd.



JLR's internal marketing planning documents over the same period of time also show that JLR intends the U.S. to be one of its major markets for its new DEFENDER vehicle. (Exh. Z at LND9589, 9645.) And several witnesses have confirmed in deposition testimony that JLR has always intended to bring new DEFENDER vehicles back to general consumers in the U.S. (Exh. G at 34:12-35:8, 36:2-10; Ex. AA at 236:16-237:7; Ex. BB at 37:1-22, 38:22-39:14.)

JLR's plans will come to fruition in the near future. JLR has announced that it will debut the redesigned DEFENDER worldwide (including in the U.S.) by 2020. (Exh. CC.)

### 5.    Sustained Enthusiasm for DEFENDER

After JLR stopped selling new DEFENDER vehicles to general consumers in the U.S, its popularity actually increased.  (Exh. K Letorney Dep. Tr. at 148:8-16.) Most tellingly, the price for a pre-owned DEFENDER skyrocketed. (Exh. DD.) Still today, pre-owned DEFENDER vehicles can sell for over $100,000 (more than double the original sales price). (*Id*.) Media attention has also remained consistent, with many publications noting that pre-owned DEFENDERs remain a coveted commodity. (Exh. EE at JLR004150 – "Today, the vehicle is in such demand in SUV-crazed America that thousands of Defenders have been imported privately, some illegally." *See also* Exh. CC at LND16838.)

In addition, numerous licensed Land Rover enthusiast clubs arrange classic and off-road events that prominently feature the DEFENDER vehicle. (Exh. FF; Exh. GG; Exh. K at 190:3-7 and 191:21-25.) A number of people and companies attempt to trade off the goodwill of the DEFENDER mark, requiring JLR to invest



significant time and resources policing its mark against third-parties who attempt to adopt DEFENDER and/or DEFENDER-formative marks for related goods and services.  (*See e.g.,* Exh. HH.)

The DEFENDER has become a staple of mainstream pop culture.   For example, the DEFENDER has been featured in numerous TV shows and movies. (See Exh. II.) Some prominent examples include the 2001 Tomb Raider movie, and several James Bond films, including the most recent—Spectre.  (*Id.*)  In fact, as part of the promotional efforts for Spectre, JLR brought one of the DEFENDER vehicles used in Spectre to the U.S. and displayed it in various locations—a fact that JLR heavily advertised, including on its social media pages. (Exhs. JJ, KK.) JLR has also signed numerous product placement agreements for use of the DEFENDER in advertising campaigns for, *inter alia*, Hewlett-Packard, The Peterson Museum, and Ralph Lauren. (Exhs. LL-NN.)

## C.  JLR's Renewals of the DEFENDER Registration

JLR filed the application that led to the '707 Registration on September 3, 1991. Since then, pursuant to U.S. Patent and Trademark Office ("PTO") rules for maintaining a registration,[8] JLR has filed three declarations with the PTO (in 1999, 2003 and 2014) attesting to the use of the DEFENDER mark in commerce. As explained below, the undisputed evidence shows that JLR was using its DEFENDER mark on or in connection with vehicles in the U.S. at these times.

---

[8] *See* 15 U.S.C. §1058 (a) – (b).



9

### 1.    The November 5, 1999 Renewal

JLR submitted the first renewal to the PTO on November 3, 1999.  In this renewal, JLR's Head of Trademarks and Authorized Signatory, Philip Cooper, declared that the DEFENDER mark "is in use in commerce on or in connection with all goods/services in the existing registration." (Exh. OO.) Pursuant to PTO requirements, JLR also submitted a specimen showing how it was using the DEFENDER mark in commerce at that time.

It is undisputed that JLR sold new DEFENDER vehicles in the U.S. through December of 1998 (and many of those vehicles were still under JLR's manufacturing warranty in 1999). (Exhs. D, G at 194:14-24.) It is further undisputed that, between December 1998 and November 3, 1999, JLR Franchise Dealerships continued to sell pre-owned DEFENDER vehicles, and JLR continued to support DEFENDER vehicles in the U.S. by, *inter alia*, providing replacement DEFENDER parts, making warranty repairs and servicing vehicles through its franchisees. (Exhs. D, O-Q, R, WW.)

### 2.    The October 24, 2003 Renewal

JLR submitted the second renewal to the PTO on October 24, 2003. (Exh. PP.) The declaration for this renewal was signed by JLR's Assistant Company Secretary, Susan Pearson and included a specimen.

As in 1999, JLR Franchise Dealerships were still selling pre-owned vehicles, and JLR continued providing DEFENDER replacement parts, making warranty repairs, and servicing vehicles. (Exhs. D, O-Q, R, WW.)  Additionally, JLR showed the DEFENDER CKD at the SEMA show in Las Vegas in 2003, and just two years



prior JLR had sold a fleet of DEFENDER vehicles to Busch Gardens in Florida. (Exhs. I, J, U.)

While Ms. Pearson does not have specific recollection of signing the 2003 declaration (a fact that is unsurprising given that she signed the declaration nearly fifteen years ago and signs hundreds of documents each year (Exh. QQ at 120:7-12)), Ms. Pearson testified that she always consults with subject matter experts to ensure any document she signs is accurate:

> Q.  How do you work with subject-matter experts in connection with your job?
>
> A.  So all the documents I get to sign, obviously I can't be fully conversant with all the detail; so I rely on the subject-matter experts to confirm that the document is accurate and okay to sign.
>
> And before I sign the documents, I normally would always ask the subject-matter expert that's presented it to me that it's okay to sign.
>
> Q.   And when do you employ that practice that you've just described?
>
> A.   Before I sign anything.

(*Id.*, at 122:2-14.)

### 3.    The February 19, 2014 Renewal

The most recent renewal was in February 19, 2014.  (Exh. RR.)  Anna-Lisa Corrales, JLR North America's general counsel and JLR's authorized representative, signed the declaration on JLR's behalf, which included the requisite specimen.

Again, there is no question JLR was using the DEFENDER mark on vehicles in commerce when JLR submitted the 2014 renewal. JLR Franchise Dealerships continued to sell pre-owned vehicles. (Exh. D.) JLR continued providing



11

replacement DEFENDER parts, making warranty repairs and servicing vehicles. (Exh. O-R, WW.) JLR displayed the DEFENDER DC100 in California and New York in 2011 and 2012, respectively. (Exh. W.) Further, both JLR and its licensee, Rovers North, have presented uncontroverted evidence that JLR sold new DEFENDER vehicles for the U.S. military and military contractors to Rovers North, a U.S. company, from 2009-2016.  (Exhs. K at 131:11-13, L, M.)

In light of the foregoing undisputed evidence, JLR moves for summary judgment on BRP's counterclaims.

## III.   ARGUMENT

### A.   Legal Standard

Summary judgment is appropriate after there has been "adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.   Abandonment

To prevail on its abandonment counterclaim, BRP must prove by clear and convincing evidence that JLR (1) failed to use the mark in commerce, ***and*** (2) had no intent to resume use.  *See* 15 U.S.C. §1127; *Stilson & Assoc., Inc. v. Stilson Consulting Group, LLC*, No. 03-4458, 2005 WL 1059277, at *2 (6th Cir. May 6, 2005) (stating movant has "a 'stringent,' 'heavy,' or 'strict burden of proof.'"); *Nolan LLC v. TDC International Corp.*, No. 06-14907, 2008 WL 11355576, at *2



(E.D. Mich. Mar. 31, 2008) (applying clear and convincing evidence standard). Given the undisputed evidence, BRP cannot prove even a *prima facie* claim of abandonment.

### 1.   JLR Never Ceased Using Its DEFENDER Mark

JLR produced evidence that JLR, its franchisees and its other licensees have continuously used the DEFENDER mark in commerce in the U.S. since 1992.[9] Specifically:

- Since 1998 (and before), JLR Franchise Dealerships have continuously sold pre-owned DEFENDER vehicles. (Exhs. D, F, N.)

- Since 1998 (and before), JLR has consistently manufactured DEFENDER vehicle parts that JLR sells through JLR Franchise Dealerships and other licensees. (Exhs. F, O-Q, SS, WW.)

- Since 1998 (and before), JLR Franchise Dealerships have performed warranty and non-warranty repairs and maintenance services on DEFENDER vehicles. (Exhs. F, R.)

- In 2001, JLR sold a fleet of new DEFENDER vehicles to Busch Gardens in Tampa, Florida. (Exhs. I, J.)

- From at least 2009 to 2016, JLR sold new DEFENDER vehicles to Rovers North in the U.S., who then sold them to the U.S. military and U.S. defense contractors.[10] (Exhs. K at 132:11-13; L-M, TT

---

[9] Except in circumstances of naked licensing, it is black letter law that the use of a mark by an agent or licensee inures to the benefit of the trademark owner. *See FDIC v. Homestead Mortg. Co.*, No. 04-74842, 2010 U.S. Dist. LEXIS 136392, *32 (E.D. Mich. Dec. 27, 2010) ("A licensee's use inures to the benefit of the licensor-owner of the mark ...."). Naked licensing, which is not alleged here, occurs when a licensor fails to exercise sufficient quality control over the goods bearing the licensee's mark. *Id.* at *36.

[10] Rovers North's sales to the military ended in 2016 only because JLR shut down production of new DEFENDER, worldwide, to prepare for the new DEFENDER that will debut by 2020. (Exh. K at 141:1-10, 150:25-151:3.)



BRP has not disputed that these sales occurred, and constitute use in commerce, and it cannot. *See* 15 U.S.C. §1127 ("The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade . . ..  For purposes of this chapter, a mark shall be deemed to be use in commerce—(1) on goods when—(A) it is placed in any manner on the goods in their containers or the displays associated therewith, and (B) ***the goods are sold or transported in commerce***.")

Summary judgment on BRP's claim of abandonment is warranted for this reason alone. *See KeyCorp. v. Key Bank & Trust*, 99 F. Supp. 2d 814, 827 (N.D. Ohio 2000) ("Because KBT has failed to show that KeyCorp has discontinued use of the L-shaped KEY BANK design and mark or that KeyCorp does not intend to resume use of the mark, elements essential to its affirmative defense of abandonment and on which it bears the burden of proof at trial, the court grants KeyCorp's Motion for Summary Judgment as to KBT's Affirmative Defense of Abandonment . . .."); *DC Comics v. Kryptonite Corp.*, 336 F. Supp. 2d 324, 335 (S.D.N.Y. 2004) (granting summary judgment of no abandonment of the mark KRYPTONITE where the registrant presented evidence that the mark "regularly appeared on licensed consumer merchandise over the years and the Kryptonite mark or the appearance of Kryptonite have been used in connection with consumer products such as toys, apparel, books, calendars, games, greeting cards, novelty items, and video games."); *Nolan LLC*, 2008 WL 11355576 at *3 (granting summary judgment of no abandonment where plaintiff presented unrefuted evidence the mark was in continuous use); *Timm Med. Techs., Inc. v. SOMA Blue, Inc.*, No. 99-2011, 2002 U.S. Dist. LEXIS 926, at *16-*21 (D. Min. Jan. 15, 2002) (same); *Grocery Outlet*



*Inc. v. Albertsons, Inc.*, No. C 06-02173, 2008 U.S. Dist. LEXIS 101999, at \*17 (N.D. Cal. Dec. 17, 2008) ("Because the Court finds that there was continued use through 2005 and there is undisputed evidence in the record indicating Albertsons' intent to resume use within the relevant time period, the Court finds that summary judgment [of no abandonment] is appropriate . . ..").

### 2. JLR Always Had an Intent to Resume Use of Its DEFENDER Mark

Even if the above-listed uses did not constitute use in commerce during all relevant times, there is ample *undisputed* evidence JLR intended to resume use of the mark.[11] Specifically:

- Since 1998, JLR has continued to support the vehicle and brand by continuing to manufacture replacement parts and provide repair services (via JLR Franchise Dealerships). (Exhs. F, O-Q, SS, WW.)

- Since 1998, JLR has continuously enforced its DEFENDER mark against infringers. (Exh. HH.)

- Since 1998, JLR has consistently licensed the DEFENDER mark to third-parties for DEFENDER toy replicas. (Exh. S.)

- Since 1998, JLR has expressly or by course of dealing licensed the DEFENDER mark to JLR Franchise Dealerships. (Exh. F.)

- In 2000, JLR publicly stated its intent to resume new vehicle sales to general consumers. (Exh. H.)

- In 2001, JLR sold new DEFENDER vehicles to Busch Gardens. (Exhs. I, J.)

---

[11] If BRP could make a showing of nonuse, which it cannot, the burden of production to produce evidence showing an intent to resume use would shift to JLR. *FDIC v. Homestead Mortg. Co.*, No. 04-74842, 2010 U.S. Dist. LEXIS 136392, at \*31 (E.D. Mich. Dec. 27, 2010). But, the ultimate burden of persuasion to show abandonment by clear and convincing evidence remains with BRP. *Id.*



- In 2003, JLR presented the DEFENDER CKD at the SEMA show in Las Vegas. (Exh. U.)

- From 2009 to 2016, JLR sold new DEFENDER vehicles to Rovers North, who then sold them to U.S. military and defense contractors (via a U.S. licensee). (Exhs. K at 131:11-13; L-M, TT.)

- In 2011, JLR presented the DEFENDER DC100 at the Los Angeles Auto Show. (Exhs. V, W.)

- In 2012, JLR presented the DEFENDER DC100 at the New York Auto Show. (Exh. W.)

- From at least 2012 to the present, JLR has made multiple public statements about its plans to bring new DEFENDER vehicles back to U.S. general consumers. (Exhs. X, UU, VV.)

- Internal JLR documents dating back to 2012 show JLR's planning to resume new vehicle sales to general consumers in the U.S. (Exhs. Y, Z.)

- Since 1998, JLR has continued marketing the DEFENDER directly and through licensees/agents, including: print and other advertisements; featured use in classic/off-road events sponsored by JLR and/or licensees; support for licensee advertising that features or includes the DEFENDER; and product placement agreements for use of the DEFENDER in major motion pictures. (Exhs. K at 190:3-7; 191:21-25, O-Q, FF, GG, II-NN.)

- JLR has publicly announced imminent plans to sell the new DEFENDER in the U.S. (Exh. X.)

- JLR's witnesses have confirmed in deposition testimony that JLR has always intended to bring new DEFENDER vehicles back to general consumers in the U.S. (Exh. G at 34:12-35:8, 36:2-10; Ex. AA at 236:16-237:7; Ex. BB at 37:1-22, 38:22-39:14.)

These activities required significant investments of time and money and directly contradict the notion that JLR had no intention to resume use of the DEFENDER mark. BRP has not and cannot come forward with *any* evidence to the contrary.

Notably, at least two courts declined to find abandonment on far less and after longer gaps in new sales to consumer.  In *Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d



209, 216 (4th Cir. 1982) the Court affirmed the district court's holding that, despite 23 years of non-use, there was sufficient evidence of intent to resume use because Skippy attempted to reenter the market in 1945, had Board of Directors meetings occasionally, and ultimately resumed use.

Similarly, in *Ferrari S.p.A. Escercizio Fabbriche Automobili e Corse v. McBurnie*, No. 86-1812, 1989 WL 298658, *7-8 (S.D. Cal. June 1, 1989), the court found no abandonment although Ferrari had not sold the DAYTONA SPYDER vehicle for 13 years and had no intent to resume new vehicle sales, because Ferrari continued to manufacture and sell replacement parts, the cars were still in the market, and there was demonstrable evidence of residual goodwill in the mark.

The above undisputed evidence shows JLR's intention to resume new sale use of the DEFENDER mark, and significantly exceeds the evidence found sufficient in the above-discussed cases.

### 3.    JLR has Residual Goodwill in the DEFENDER mark

Finally, even if BRP could meet its high burden of proof, residual goodwill in a mark among consumers negates a claim of abandonment. *See Ferrari S.p.A.*, 1989 WL 298658 at *7-8 (noting that, beyond Ferrari's continued sale of parts and that the cars were still on the road, Ferrari retained residual goodwill because the vehicle was still strongly and positively associated with Ferrari); *Am. Motors Corp. v Action-Age*, 178 U.S.P.Q. 377, 378 (TTAB 1973) (Finding "a considerable reservoir of goodwill" in American Motors' RAMBLER mark that inured to American Motors due to, *inter alia*, "the large number of 'RAMBLER' vehicles still on the road" and



American Motors' "activities in supplying 'RAMBLER' parts and accessories to owners of these vehicles").

JLR's enduring goodwill is evident from, among other things: (1) the substantial price pre-owned DEFENDERS command (Exh. DD); (2) unrefuted testimony from the Rovers North owner, whose business has focused on Land Rover vehicles and consumers for over 25 years, that the vehicle became more popular after 1998 and has sustained that popularity since (Exh. K at 148:8-16); (3) consistent third-party media coverage describing the DEFENDER as iconic and noting sustained consumer enthusiasm (Exh. CC; Exh. EE); (4) numerous enthusiast clubs (Exh. FF, Exh. GG; Exh. K at 190:3-7 and 191:21-25); and (5) BRP's (and others') attempts to co-opt the DEFENDER brand and imagery (Exh. HH). Indeed, it is recognized that goodwill often endures for products, like automobiles, that by their nature tend to remain in use in the market for extended periods of time. *See* McCarthy on Trademarks § 17:15 ("Famous automobile marks of models no longer in production retain their recognition value and goodwill as a result of continuing public use of such relatively long-lasting products.")

## C.    Fraud

BRP also cannot establish even a *prima facie* case for its fraud counterclaim. "[A] trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO." *In re Bose*, 580 F. 3d 1240, 1245 (Fed. Cir. 2009). A party claiming fraud bears a heavy burden; it must be proven by clear and convincing evidence. *Id.* at 1243 ("[T]he very nature of the charge of fraud requires that it be



18

proven to the hilt with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.") (citations and quotations omitted). Further, while circumstantial evidence can be used to show fraud, that evidence must be considered in light of the high burden of proof, and "inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." *Id.* at 1245 (citing *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1257, 1366 (Fed. Cir. 2008)).

### 1. JLR Did Not Make a False, Material Misrepresentation

Here, there is simply *no evidence* JLR made a false representation to the PTO (intentionally or otherwise) during its renewals in 1999, 2003 or 2014. As discussed above, the undisputed evidence shows that at the time of each renewal JLR was using its DEFENDER mark in commerce on or in connection with vehicles. At the time of each renewal, JLR was continuing to fully support the brand by selling replacement parts and providing warranty and maintenance services through JLR's Franchise Dealerships, and JLR Franchise Dealerships were selling pre-owned vehicles. (Exhs. D, O-R, WW.) Additionally, JLR sold a fleet of vehicles to Busch Gardens in 2001, displayed the DEFENDER CKD kit at the SEMA show in Las Vegas in 2003, and sold vehicles to the U.S. military and U.S. defense contractors via licensee Rovers North in 2014. (Exh. I-J, K at 132:11-13, L-M, U, TT.) Because BRP has not and cannot dispute that these sales and services occurred, BRP cannot meet its burden to show by clear and convincing evidence that JLR made false, material misrepresentations to the PTO.



19

### 2.     JLR Did Not Intend to Defraud the PTO

Even if BRP could show that JLR made a false, material misrepresentation to the PTO, which it cannot, BRP's fraud claim still fails because BRP has produced no evidence that anyone at JLR intended to defraud the PTO.  On the contrary, the undisputed evidence shows that JLR was using the mark on or in connection with vehicles at all relevant times. Even if BRP could show that some of JLR's aforementioned sales and other uses did not constitute use in commerce, JLR's good faith but mistaken belief that they did does not rise to the level of fraud. *See In re Bose*, 580 F.3d 1240, 1246 (Fed. Cir. 2009) ("There is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive."). Unsubstantiated speculation about JLR's intent is not enough. BRP must come forward with actual ***evidence*** of deceptive intent. *Id.* ("Unless the challenger can point to evidence to support an inference of deceptive intent, it has failed to satisfy the clear and convincing evidence standard required to establish a fraud claim.").

In short, BRP has a heavy burden in proving fraud—one it simply cannot carry.  Thus, summary judgment on this claim in favor of JLR is warranted.

### 3.     The Specimens JLR Submitted to the PTO Do Not Provide a Basis for Cancellation

Throughout this case, BRP has argued that the specimens JLR submitted to the PTO with its renewals provide a basis to cancel the '707 Registration because JLR has been unable to show where and to whom the vehicles shown in specimens were sold. JLR disagrees—the PTO accepted the specimens and they accurately



represent how (*e.g.*, badging) JLR was using its DEFENDER mark or vehicles. In any event, BRP ignores that "[t]he law is settled that the insufficiency of the specimens, per se, does not constitute grounds for cancelling a registration." *Marshall Field & Co. v. Mrs. Fields Cookies*, 1989 TTAB LEXIS 17, *10-11 (TTAB March 7, 1989). The reason is that the purpose of specimens is not to show *that* a mark is being used in commerce, but rather to show *how* the mark is being used. *Id.* at *11-12 (purpose of a specimen is to confirm that the mark is being used as a trademark or service mark, not whether it is in use). Indeed, in *Marshall Field & Co.*, the TTAB explained that it would be inherently unfair to cancel a registrant's mark based on an alleged deficiency in the specimen that was never raised by the PTO examiner, because if it had been raised the registrant would have been permitted to cure any deficiency by submitting a substitute specimen:

> Moreover, fairness dictates that the ex parte question of the sufficiency of the specimens not be the basis for sustaining a petition for cancellation. If the Examining Attorney had objected to the specimens during the examination of the application, the applicant would have had an opportunity to submit acceptable substitute specimens. Assuming, arguendo, that registrant's specimens are unacceptable, it would be unfair to penalize registrant for not submitting substitute specimens when that requirement was never made by the Examining Attorney.

*Id.* at *12 (citing *Century 21 Real Estate Corp. v. Century Life of Am.*, 10 U.S.P.Q.2d 2034, 2035 (TTAB 1986)).

So, even if BRP could show the specimens JLR submitted to the PTO were somehow deficient – which they were not – JLR's specimens *cannot* provide a basis for cancellation.



21

## D. BRP's Void *Ab Initio* Claim Fails as a Matter of Law

Finally, BRP also counterclaims that JLR's DEFENDER registration should be cancelled as void *ab initio* on the same grounds as the fraud claim – JLR's alleged failure to use the DEFENDER mark in commerce.[12]  As described above, however, JLR has used its DEFENDER mark on or in connection with vehicles consistently from 1992 to the present.

Regardless, BRP's void ab *initio* counterclaim is barred as a matter of law. The Sixth Circuit recently held that a party can petition to cancel a mark that has been registered on the Principal Register for more than 5 years on the limited grounds enumerated in 15 U.S.C. §1064(3), which the Court said does ***not include void ab initio***:

> Under §1064(3), petitions for cancellation of a mark registered for five years may be brought only for a limited set of reasons, including fraudulent registration or if the mark has become generic. *Id.* Void *ab initio*, the basis of IntelliJet Group's claims, is not one of these reasons and §1064 bars its counterclaim for cancellation of the mark.)

*NetJets Inc. v. IntelliJet Grp., LLC*, No. 15-4230, 2017 U.S. App. LEXIS 2062, *9 (6th Cir. Feb. 3, 2017).  Here, JLR's mark has been registered on the Principal Register for 25 years. (Exh. E.) Thus, as a matter of law, BRP cannot challenge JLR's registration on the grounds of void *ab initio*.

---

[12] The main differences between a claim of void *ab initio* and fraud are: (1) there is no intent element for a void *ab initio* claim; and (2) a void *ab initio* claim can be proven by a preponderance of evidence.  *Adidas Am., Inc. v. Calmese*, No. 08-cv-91, 2010 WL 4861444, at *2 (D. Ore. Nov. 19, 2010).



## IV.    CONCLUSION

Because there are no genuine issues of material fact regarding BRP's Counterclaims, JLR respectfully requests that the Court grant summary judgment on them in JLR's favor.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

Dated: <u>July 16, 2018</u>

<u>/s/ Frank A. Angileri</u>
Frank A. Angileri (P45611)
Chanille Carswell (P53754)
Rebecca J. Cantor (P76826)
Alan J. Gocha (P80972)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel: (248) 358-4400 / Fax: (248) 358-3351
Email:  fangileri@brookskushman.com
        ccarwell@brookskushman.com
        agocha@brookskushman.com
        rcantor@brookskushman.com

*Attorneys for Plaintiff*
*Jaguar Land Rover Limited*



23

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on July 16, 2018, I electronically filed the foregoing **PLAINTIFF JAGUAR LAND ROVER'S MOTION FOR SUMMARY JUDGMENT and BRIEF IN SUPPORT** with the Clerk of the Court for the Eastern District of Michigan using the ECF System which will send notification to all users listed on the Court's Notice of Electronic Filing.

I also certify that I served the unredacted versions of the above-listed Exhibits upon attorneys for defendant and James R. Menker, attorneys for defendant, via email:

Dean W. Amburn     dwa@amburnlaw.com
James R. Menker    eastdocket@holleymenker.com


**BROOKS KUSHMAN P.C.**

 /s/ Frank A. Angileri
Frank A. Angileri (P45611)
Chanille Carswell (P53754)
Rebecca J. Cantor (P76826)
Alan J. Gocha (P80972)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel: (248) 358-4400 / Fax: (248) 358-3351
Email: fangileri@brookskushman.com
       ccarwell@brookskushman.com
       agocha@brookskushman.com
       rcantor@brookskushman.com

*Attorneys for Plaintiff*
*Jaguar Land Rover Limited*

