## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**JAGUAR LAND ROVER LIMITED,**
**a United Kingdom company,**

     *Plaintiff,*

**v.**

**BOMBARDIER RECREATIONAL**
**PRODUCTS, a Canadian company,**

     *Defendant.*

Case No. 2:16-cv-13386-GAD-SDD

Hon. Gershwin A. Drain

*JURY TRIAL REQUESTED*

## PLAINTIFF JAGUAR LAND ROVER'S
## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT



## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

I.      INTRODUCTION ...................................................................1

II.     STATEMENT OF MATERIAL FACTS ....................................1

        A.      JLR's New Vehicle Imports ...........................................2

        B.      JLR's New Vehicle Sales to Rovers North .......................3

        C.      JLR Franchise Dealerships' Pre-Owned Sales....................4

III.    ARGUMENT............................................................................5

        A.      Abandonment ...............................................................5

                1.      BRP Cannot Meet the High Burden Required to Show
                        Abandonment ................................................... 5

                2.      JLR Never Ceased Using Its DEFENDER Mark ....... 5

                        a.      JLR's Sales of Pre-Owned DEFENDER Vehicles
                                by its Dealerships Constitute Use in Commerce ............. 6

                                (1)     JLR's Franchise Agreements are a License,
                                        but are not a Naked License ...................................6

                                (2)     The First Sale Doctrine does not Apply...............10

                                (3)     The Cases Cited by BRP are Distinguishable......11

                        b.      JLR's Sales to Rovers North and Busch Gardens
                                were not "Token Use" .................................................. 13

                3.      JLR Always Intended to Resume Use of DEFENDER .......... 15

        B.      Void Ab Initio ............................................................18

                1.      BRP's Claim Fails as a Matter of Law .................... 18



        2.     BRP's Claim Also Fails on the Merits.................................... 18

        a.     1999 and 2003 Renewals ........................................... 19

        b.     2014 Renewal......................................................... 21

   C.     Damages .............................................................................21

        1.     JLR's Lost Sales.................................................... 22

        2.     Disgorgement of BRP's Profits ............................. 22

IV.   CONCLUSION.............................................................................25



# TABLE OF AUTHORITIES

## Cases

*Allard Enters. v. Advanced Programming Res., Inc.*,
  146 F.3d 350 (6th Cir. 1998) ..........................................................13

*Am. Ass'n for Justice v. Am. Trial Lawyers Ass'n,*
  698 F. Supp. 2d 1129, 1138 (D. Minn. 2010) ................................13

*Australia Gold, Inc. v. Hatfield*,
  436 F.3d 1228 (10th Cir. 2006) .................................................7, 10

*Balance Dynamics Corp. v. Schmitt Ind.*,
  204 F.3d 683 (6th Cir. 2000) .......................................................24

*Crash Dummy Movie, LLC v. Mattel, Inc.*,
  601 F.3d 1387 (Fed. Cir. 2010) ....................................................13

*D56, Inc. v. Berry's Inc.*,
  955 F. Supp. 908 (N.D. Ill. 1997).................................................10

*Emmpressa Cubana Del Tabaco v. Culbro Corp.*,
  213 F. Supp. 2d 247 (S.D.N.Y. 2002) ..........................................16

*Exxon Corp. v. Oxxford Clothes, Inc.*,
  109 F.3d 1070 (5th Cir. 1997) ........................................................8

*FDIC v. Homestead Morg. Co.*,
  2010 U.S. Dist. LEXIS 136392 (E.D. Mich. Dec. 27, 2010)..................8, 16

*First Flight Assocs. v. Prof'l Golf Co.*,
  527 F.2d 931 (6th Cir. 1975) ..........................................................7

*General Motors Corp. v. Aristide & Co., Antiquaire de Marques*,
  87 U.S.P.Q.2d 1179 (TTAB 2008)...........................................17, 18

*Kardex Systems, Inc. v. Sistemco N.V.*,
  583 F. Supp. 803 (D. Me 1984)................................................16, 17

*L.F.P.IP, Inc. v. Hustler Cincinnati, Inc.*,



      2011 U.S. Dist. LEXIS 121570 (S.D. Ohio Oct. 20, 2011) ...........................7

*Laukus v. Rio Brands, Inc.*,
      391 Fed. Appx. 416 (6th Cir. 2010).................................................22

*Lucky's Detroit, LLC v. Double L, Inc.*,
      2014 U.S. Dist. LEXIS 137588 (E.D. Mich. Sept. 30, 2014) ............... 22, 23

*Marshall Field & Co. v. Mrs. Fields Cookies*,
      *1989 TTAB LEXIS 17 (TTAB March 7, 1989)*.............................................20

*Morehouse Mfg. Corp. v. J. Strickland & Co.*,
      407 F.2d 881 (CCPA 1968) ....................................................... 20, 21

*Mt. Top Bev. Group, Inc. v. Wildlife Brewing N.B., Inc.*,
      338 F. Supp. 2d 827 (S.D. Ohio 2003)..........................................15

*NetJets Inc. v. IntelliJet Grp., LLC*,
      2017 U.S. App. LEXIS 2062 (6th Cir. Feb. 3, 2017)....................................18

*Nolan LLC v. TDC International Corp.*,
      2008 WL 11355576 (E.D. Mich. Mar. 31, 2008)...........................................5

*Oshman's Sporting Goods, Inc. v. Highland Import Corp.*,
      16 U.S.P.Q.2d 1395 (TTAB 1990)....................................................12

*Parfums Nautee Ltd. v. Am. Int'l Indus.*,
      22 U.S.P.Q.2d 1306 (TTAB 1992).................................................11

*Playboy Enter. v. Baccarat Clothing Co.*,
      692 F.2d 1272 (9th Cir. 1982) ........................................ 23, 24, 25

*Shelby v. Ford Motor Co.*,
      28 U.S.P.Q.2d 1471 (C.D. Cal. 1993) ...........................................14

*Societe des Produits Marnie Lapostolle v. Distillerie Moccia S.R.L.*,
      10 U.S.P.Q.2d 1241 (TTAB 1989).................................................12

*Stilson & Assoc., Inc. v. Stilson Consulting Group, LLC*,
      2005 WL 1059277 (6th Cir. May 6, 2005)......................................5



*Tumblebus, Inc. v. Cranmer*,
 399 F.3d 754 (6th Cir. 2005) ............................................................8

*United States Soo Bahk Do Moo Duk Kwan Fed'n, Inc. v. Tang Soo Karate Sch., Inc.*,
 2015 U.S. Dist. LEXIS 107955 (M.D. Pa. Aug. 17, 2015) ................... 23, 25

*Wynn Oil Co. v. American Way Serv. Corp.*,
 943 F.2d 595 (6th Cir. 1991) ............................................... 8, 22, 23

## Statutes

15 U.S.C. § 1055 ...........................................................................7, 8
15 U.S.C. §1063 .............................................................................24
15 U.S.C. §1117 .............................................................................22
15 U.S.C. §1127 ..........................................................................5, 13

## Other Authorities

McCarthy on Trademarks § 25.41 .......................................................10
McCarthy on Trademarks §19.108 ......................................................13



## I.    INTRODUCTION

JLR has presented evidence that in the U.S., JLR and/or its licensees have continuously (since 1998 and before) sold new and/or pre-owned DEFENDER vehicles, sold DEFENDER replacement parts, provided warranty and non-warranty repair services, presented DEFENDER vehicles at trade shows, and engaged in promotional activities and advertising that featured or included the DEFENDER. Because BRP **_does not dispute_** that these DEFENDER sales, services, and promotions occurred, **_nor has it come forward with contrary evidence_**, BRP's claims of abandonment and void ab *initio* necessarily fail.

BRP's request for summary judgment on damages also fails. JLR does not seek "lost sales" damages if it prevails on its affirmative claims. And there is at least a question of fact as to whether JLR is entitled to disgorge BRP's █████ profits from infringement of JLR's trademark.

For all these reasons, discussed more fully below, JLR asks the Court to deny BRP's motion for summary judgment in its entirety.

## II.    STATEMENT OF MATERIAL FACTS[1]

JLR began selling its DEFENDER vehicle in the U.S. in 1992. In 1993, the PTO issued JLR a federal registration for the DEFENDER mark for "motor land vehicles; namely station wagons." (Dkt. 102 at Ex. E.) As was the case throughout the world, the DEFENDER quickly gained a reputation in the U.S. as being in a class

---

[1] To avoid unnecessary duplication, JLR incorporates by reference the "Factual Background" in JLR's cross-motion for summary judgment. (Dkt. 102 at 2-12.) JLR provides here an abbreviated summary of the facts focused on JLR's opposition to BRP's motion.



1

of its own for ruggedness and off-road durability. The DEFENDER came to be known as the ultimate off-road vehicle. (*See e.g. Id.* at Ex. EE, LND 2822-23.)

From 1992-1998, JLR through its franchise dealerships sold over 7000 DEFENDERs in the U.S. (Dkt. 102, Ex. D.) In 1998, JLR was forced to suspend sales of new DEFENDER vehicles to the general public because it did not include airbags as required under new U.S. airbag laws. Given the DEFENDER vehicle's popularity in the U.S. and its importance to the Land Rover brand, however, JLR vowed to bring it back to general consumers and (via then-owner Ford) publicly stated so in 2000. (*Id.* at Ex. H.)

In the interim (as outlined more fully in JLR's cross-motion), (1) JLR continued selling new vehicles to commercial customers and showing DEFENDER vehicles at trade shows (*Id.* at Exs. I, J, K at 132:11-13, L-M, SS-TT), (2) JLR's dealerships continued selling and servicing pre-owned DEFENDER vehicles (*Id.* at Exs. D, F, N, R), (3) JLR and its dealerships and licensees continued selling DEFENDER replacement parts (*Id.* at Exs. O-Q, WW; Dkt. 102 at 6 n.6), (4) JLR continued licensing the mark to third-parties (*Id.* at Ex. S; Ex. 1), and (5) JLR and its dealerships and licensees continued promoting DEFENDER vehicles and events that featured or included DEFENDER vehicles (*Id.* at Exs. GG, II, LL-NN).

BRP has not come forward with any evidence that refutes the above-listed sales, services and promotions. Rather, BRP's motion is based almost entirely on tangential matters irrelevant to the Court's analysis and an inaccurate, misleading and/or incomplete recitation of the relevant facts, as JLR explains below.

## A. JLR's New Vehicle Imports



BRP states that JLR did not import any new DEFENDER vehicles into the U.S. after 1997. (Dkt. 127 at 7.) Yet, BRP acknowledges that JLR imported and sold a fleet of new DEFENDER vehicles to Busch Gardens in 2001, and that from 2009-2016 JLR sold new DEFENDER vehicles to a U.S. licensee (Rovers North) who resold them to the U.S. military and U.S. defense contractors.[2] (*Id.* at 4-5; Dkt. 102, Exs. I, J, L-M, SS-TT.)  Further, BRP cannot dispute that JLR imported multiple DEFENDER concept vehicles into the U.S. for trade shows including the DEFENDER CKD concept vehicle (shown in 2003 SEMA in Las Vegas) (Dkt. 102, Ex. U; Dkt. 103 at ¶17) and the DEFENDER DC100 concept vehicle (shown in 2011 in Los Angeles and 2012 in New York).[3] (Dkt. 102, Exs. V, W; Dkt. 103 at ¶18.)

## B.   JLR's New Vehicle Sales to Rovers North

BRP does not dispute that JLR sold new DEFENDER vehicles to Rovers North from 2009-2016. (Dkt. 127 at 5.) Instead, BRP erroneously claims that Rovers North's vehicle sales to the U.S. military are unsubstantiated, were of "unknown type," and were used/delivered outside the U.S. (*Id.* at 5, 21.) In fact, Rovers North's invoices and JLR's records confirm Rovers North's unrefuted testimony that the vehicles were DEFENDER vehicles. (Dkt. 102, Ex. L-M; Ex. 2 at 110:16-24.) The records also confirm that JLR delivered the vehicles to the U.S.  (Ex. 2 at 70:7-15, 94:4-24, 122:10-123:10; Ex. 3.)  And regardless of where the vehicles ultimately

---

[2] BRP suggests that the sales to Busch Gardens and Rovers North were somehow diminished because the vehicles were modified to suit their purposes. (Dkt. 127 at 4-5.) BRP, however, cites no authority for this claim.

[3] Transporting goods into the U.S. is a "use in commerce" under the express language of the Lanham Act. *See* 15 U.S.C. §1127.



ended up,[4] it is undisputed that JLR sold *all* of them to Rovers North in the first instance. (Ex. 2 at 303:17-305:7).[5]

## C.   JLR Franchise Dealerships' Pre-Owned Sales

JLR has presented unrefuted evidence that JLR Franchise Dealerships sold pre-owned DEFENDER vehicles to general consumers every year from 1992 to the present. BRP acknowledges these sales (Dkt. 127 at 10),[6] but disputes that they constitute use in commerce based solely on the groundless claim that the dealerships are not licensed by JLR (or, alternatively, because the license is a naked license).

In fact, and as discussed more fully below, JLR . (Dkt. 102, Ex. F.) Moreover, the agreement

" (*Id.* at LND 9724-25, ¶¶1.7, 1.9, 2.6, 2.6-2.7.)

(*Id.* at LND 9708, ¶21.)  Finally,

---

[4] BRP does not actually know the ultimate destination of any of the vehicles purchased by Rovers North, because BRP did not depose any Rovers North military or defense contractor customers.

[5] Rovers North . (Ex. 2 at 305:9-306:13.)

[6] BRP's computation of JLR's total pre-owned sales to date only include sales up to February 2017. (Dkt. 127 at 10.) JLR, however, produced updated records through April 2018. (Dkt. 102, Exs. D, N.)



(*Id.* at LND 9729, ¶¶6.9-6.11, 6.15; LND 9732, ¶9.4.) ████████████

████████████████████████ (Ex. 4, at 228:3-8.)

When BRP's deflections and distortions, are stripped away, it is apparent that BRP does not have even *prima facie* support for its counterclaims.

## III.   ARGUMENT

## A.   Abandonment

### 1.   BRP Cannot Meet the High Burden Required to Show Abandonment

As JLR explained in its own motion for summary judgment, the heavy burden of proving abandonment rests squarely with BRP. (Dkt. 102 at 12.) Indeed, to prevail, BRP must prove by ***clear and convincing evidence*** that JLR (1) failed to use the mark in commerce, ***and*** (2) had no intent to resume use.  *See* 15 U.S.C. §1127; *Stilson & Assoc., Inc. v. Stilson Consulting Group, LLC*, No. 03-4458, 2005 WL 1059277, at *2 (6th Cir. May 6, 2005) (stating movant has "a 'stringent,' 'heavy,' or 'strict burden of proof.'"); *Nolan LLC v. TDC International Corp.*, No. 06-14907, 2008 WL 11355576, at *2 (E.D. Mich. Mar. 31, 2008) (applying clear and convincing evidence standard). Given the undisputed evidence, BRP simply cannot sustain this burden.

### 2.   JLR Never Ceased Using Its DEFENDER Mark

BRP argues that "JLR abandoned its DEFENDER mark when it ceased importing new Land Rover Defenders into the U.S. in 1997." (Dkt. 127 at 7.)  This is simply untrue.  Rather, as discussed in JLR's motion for summary judgment, JLR has consistently and continually used its DEFENDER mark in commerce in the U.S.



(Dkt. 102 at 13-15, including evidence cited therein.) In particular, JLR has continued to support the brand through the manufacture and sale of replacement parts and servicing of vehicles, has licensed the DEFENDER mark to third-parties, has continued to include the DEFENDER mark in its franchise agreements with dealerships, has sold new DEFENDER vehicles to Busch Gardens and (via a licensee) the military, has presented concept DEFENDER vehicles in the U.S., and has publicly announced its imminent plans to sell a new DEFENDER in the U.S. (*Id.*) In light of this substantial, uncontroverted evidence of use, BRP cannot show that JLR stopped using the DEFENDER mark and, as a result, cannot prove abandonment at all, let alone by clear and convincing evidence.

### a.  JLR's Sales of Pre-Owned DEFENDER Vehicles by its Dealerships Constitute Use in Commerce

BRP repeatedly argues that JLR dealerships' sales of pre-owned DEFENDER vehicles are not sufficient to show use in commerce. (Dkt. 127 at 10-15.) In order to make this argument, BRP tortuously contorts inapplicable legal principles and misreads prior caselaw. In proper context, the JLR dealerships' sales of pre-owned DEFENDER vehicles prove use in commerce.

### (1)  JLR's Franchise Agreements are a License, but are not a Naked License

BRP attempts to discredit these sales by arguing that JLR's franchise agreement is alternatively: (1) not a license; or (2) a naked license. (Dkt. 127 at 12-14.) These arguments fail.

First, there can be no real question that the franchise agreement constitutes a



license to use, *inter alia*, the DEFENDER mark.[7]  BRP bases its argument on the fact that the franchise agreement between JLR and its dealerships does not contain the word "license" and instead "merely permits the use of the DEFENDER mark." (Dkt. 127 at 12.)  This is a distinction without a difference.  Indeed, what is a trademark license if it is not "permission to use a mark?"  Moreover, this circuit and courts throughout the country have repeatedly held there are no "magic words" necessary to create a license and, in fact, a license need not be in writing at all. *L.F.P.IP, Inc. v. Hustler Cincinnati, Inc.*, No. 1:09-cv-0913, 2011 U.S. Dist. LEXIS 121570, at *14 (S.D. Ohio Oct. 20, 2011) (citing *Big Cola Corp. v. World Bottling Co.*, 134 F.2d 718, 721 (6th Cir. 1943)).  Here, the franchise agreement clearly allows JLR's dealerships to use JLR's marks.  (Dkt. 102, Ex. F at §2.7) ███████ █████████████████████████████████████████████ By granting its dealerships permission to use the DEFENDER mark, JLR has licensed the mark.[8]

BRP's argument that the dealerships are not licensees because they are independent contractors (Dkt. 127 at 14) is similarly misplaced.  In fact, the Sixth Circuit has described licensees as independent contractors.  *First Flight Assocs. v. Prof'l Golf Co.*, 527 F.2d 931, 933, n. 1 (6th Cir. 1975) ("Under the trademark

---

[7] BRP does not dispute that if the franchise agreement is a proper license, these sales would inure to JLR's benefit under the Lanham Act.  15 U.S.C. §1055.

[8] BRP also makes the bizarre argument that the JLR franchise agreement does not give JLR dealerships any rights that third-parties do not have.  (Dkt. 127 at 12-13.) This is not so.  The franchise agreement allows the dealerships to use the DEFENDER mark as authorized JLR retailers—something that third-parties are unable to do.  *See Australia Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006).



license, Wynn/FFA was clearly a ***licensee, i.e., an independent contractor***.")
(emphasis added).  JLR's dealerships are clearly JLR's licensees as a matter of law,
and their use of the DEFENDER mark inures to the benefit of JLR. 15 U.S.C. §
1055; *FDIC v. Homestead Morg. Co.*, No. 04-74842, 2010 U.S. Dist. LEXIS
136392, at \*21-33 (E.D. Mich. Dec. 27, 2010).

BRP's argument that the franchise agreement is a naked license fares no
better.  A naked license occurs "when a trademark owner fails to exercise reasonable
control over the use of a mark by a licensee, such that . . . the mark can no longer
provide a meaningful assurance of quality."  *Tumblebus, Inc. v. Cranmer*, 399 F.3d
754, 764 (6th Cir. 2005).  "Because naked licensing is generally ultimately relevant
only to establish an unintentional trademark abandonment which results in a loss of
trademark rights against the world, ***the burden of proof faced by third parties in
attempting to show abandonment through naked licensing is stringent***."  *Exxon
Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075-76 (5th Cir. 1997); *Tumblebus*,
299 F.3d at 764-65 (same); *FDIC*, 2010 U.S. Dist. LEXIS 136392, at \*37-38 ("A
challenger asserting a claim of uncontrolled licensing faces a stringent burden, and
must establish that the trademark or trade name has lost significance as an indicator
of origin.") (quotations omitted).  Here, BRP cannot meet this "stringent" standard.

According to BRP, the franchise agreement is a naked license because it does
not contain quality control terms and there is no evidence JLR controls the quality
of its dealerships' products.  (Dkt. 127 at 13-14.)  This is patently untrue. ████

████████████████████████████████████

████████████████████████████████████



8

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

     Other provisions in the franchise agreement confirm the baseless nature of BRP's argument. ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

     There are no facts supporting BRP's allegation that JLR's franchise agreement is a naked license.  As a result, and particularly in light of the high burden

---

[9] BRP has alluded to the argument that this provision does not include pre-owned vehicles—a premise that was squarely rejected by JLR's witnesses. (Ex. 5, at 109:20-110:2.) Rather, JLR's witness testified that ██████████████████████  . (*Id.* at 110:23-111:10.)



9

in proving that a license is naked, BRP's argument necessarily fails.

### (2)    The First Sale Doctrine does not Apply

BRP argues that the first sale doctrine, or trademark exhaustion, prevents JLR dealerships' sales of pre-owned vehicles from constituting use in commerce. BRP misapprehends the first sale doctrine. Indeed, as BRP admits, the first sale doctrine is a defense to trademark infringement—it has nothing to do with whether the use of a mark constitutes use in commerce. McCarthy on Trademarks § 25.41 (describing the first sale doctrine as follows: "a distributor who resells branded goods without change is not an 'infringer' and thus needs no 'license.'"). BRP cites no cases, nor is JLR aware of any cases, where the first sale doctrine has been used to disregard evidence of use in commerce, as BRP would have this Court do.

Moreover, the first sale doctrine is not unlimited. On the contrary, there are myriad exceptions to this doctrine. *See generally* McCarthy on Trademarks §25:41-42. For example, distributors cannot claim or imply that they are authorized resellers when they are not. *Id.* at §25:41 (citing *Australia Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006)). This is an important exception to the first sale doctrine because it encapsulates what should be common sense—when a consumer buys a product (even a pre-owned product) from an authorized dealer, it has additional reassurances in the quality of the product. *See, e.g., D56, Inc. v. Berry's Inc.*, 955 F. Supp. 908, 910-11 (N.D. Ill. 1997) (noting that the use of authorized dealers "are designed to enhance plaintiff's reputation for quality"). This same logic supports JLR's position that when JLR's dealerships buy and resell pre-owned DEFENDER vehicles to the public it constitutes use in commerce. When a consumer buys a pre-



owned DEFENDER vehicle from a JLR-licensed dealership, that consumer is buying that product under the auspices of JLR, including all the reassurances that come therewith.  Indeed, if JLR's dealerships were not licensed and they held themselves out as authorized dealers of DEFENDER vehicles, the dealerships would be liable for trademark infringement.  Thus, even if the first sale doctrine were not solely a defense to infringement, it would still be inapplicable here.

### (3)    The Cases Cited by BRP are Distinguishable

BRP cites three cases that BRP avers support a finding of abandonment.  Even a cursory reading of these cases, however, shows they are easily distinguishable.

First, BRP cites *Parfums Nautee Ltd. v. Am. Int'l Indus.*, 22 U.S.P.Q.2d 1306 (TTAB 1992), for the proposition that sales of a product by retailers and distributors are insufficient to show use in commerce. (Dkt. 127 at 11.)  In *Parfums*, the registrant admitted that it had not imported nor sold products bearing the mark at issue for several years.  *Parfums*, 22 U.S.P.Q.2d at 1308.  Nor could registrant identify any products bearing the mark at issue that were actually for sale by third-parties.  *Id.* at 1309.  Rather, the registrant argued there was no abandonment because of "the product's long shelf life and possible continued sales by retailers." *Id*. The Trademark Trial and Appeal Board ("TTAB") disagreed, stating that ***post-abandonment*** sales by unrelated third-party retailers and distributors were insufficient to overcome a *prima facie* case of abandonment. *Id.* Here, there has been no abandonment, making this case inapposite.  Moreover, unlike the speculative sales by an unrelated third-party in *Parfums*, here JLR relies on actual vehicle sales by a licensee—a party with a clearly defined contractual relationship with JLR.



11

Second, BRP cites to *Societe des Produits Marnie Lapostolle v. Distillerie Moccia S.R.L.*, 10 U.S.P.Q.2d 1241 (TTAB 1989). In *Societe*, the registrant was unable to import its product (a liqueur) for two years due to problems finding a new distributor. *Id.* at 1243. The registrant argued that there was use as long as a bottle of its liqueur sat on a retailer's shelf. *Id.* at n. 5. The TTAB held that sales by unrelated distributors or retailers did not create residual goodwill.[10] *Id.* Unlike in *Societe*, JLR does not allege that the DEFENDER is entitled to residual goodwill based on sales by unrelated third-parties, but instead argues that sales of pre-owned vehicles by licensed dealerships constitute use in commerce.

Third, and finally, BRP cites to *Oshman's Sporting Goods, Inc. v. Highland Import Corp.*, 16 U.S.P.Q.2d 1395 (TTAB 1990). In *Oshman*, the trademark owner stopped selling products bearing the mark at issue in 1983. *Id.* at 1397. Indeed, the trademark owner "ha[d] no records of shipments to (or sales by) its factory outlet[] stores" or "any record of the inventory available after 1983." Based on this record, the TTAB found that there was no use after 1983 and, accordingly, there was a *prima facie* case of abandonment. *Id.* Here, contrary to *Oshman*, JLR has sold DEFENDER vehicles through its dealerships from 1992 through the present—and has produced records to prove it. (Dkt. 102, Exs. D, N.)[11]

---

[10] The TTAB also found there was a genuine issue of material fact regarding whether the trademark owner had an intent to resume use and, therefore, did not grant summary judgment of abandonment.

[11] It should also be noted that all three of the cases BRP cites were in the TTAB. Unlike this Court where a party alleging abandonment must meet a clear and convincing evidence standard, the TTAB applies a lower preponderance of the evidence standard. *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391



### b.   JLR's Sales to Rovers North and Busch Gardens were not "Token Use"

BRP also attempts to dismiss JLR's uncontroverted sales of vehicles to Rover North (who subsequently sold those vehicles to the military and U.S. defense contractors) and Busch Gardens as "the definition of token use." (Dkt. 127 at 7.) This argument represents a complete misunderstanding of "token use" under the Lanham Act. The prohibition against token use comes from §1127 of the Lanham Act, which defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. §1127. Token use is use "merely to reserve a right in a mark." *See* McCarthy on Trademarks §19.108. In other words, whether a use is "token use" depends on the purpose of the use, not the number of units sold. *Id.* ("[E]vidence that a sale … was made for some legitimate marketing or other commercially reasonable reason will support a finding that such activities constituted sufficient trademark 'use' under the statutory definition….") Even a single bona fide sale is sufficient to show use in commerce. *Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) ("As long as there is genuine use of the mark in commerce, however, ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition."); *Am. Ass'n for Justice v. Am. Trial Lawyers Ass'n,* 698 F. Supp. 2d 1129, 1138 (D. Minn. 2010) ("A single bona fide use of a mark is sufficient against a claim of abandonment.") (quotations omitted).

---

(Fed. Cir. 2010).  This lower burden of proof in TTAB cases further diminishes the applicability of these cases.



BRP's sole basis for arguing that JLR's sales to Busch Gardens and Rovers North were token use appears to be the number of vehicles sold. (Dkt. 127 at 7.) Yet, as established above, the number of units sold is unrelated to whether a use is bona fide. Moreover, the circumstances of JLR's sales of DEFENDER vehicles to Rovers North and Busch Gardens undercut any argument that JLR made these sales merely to reserve rights in the DEFENDER mark. With respect to the sales to Rovers North, JLR first entered into a contract with Rovers North ████████████████████ ████████████████████████████████████████ (Dkt. 102, Ex. TT.) Rovers North ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ (Ex. 2, 27:9-23; 28:2-9; 76:7-77:6.) In addition, ████████████████████████████████ ████████████████████████ (*Id.* at 232:8-18.) These actions prove genuine—not token—sales. Similarly, the Busch Gardens sales arose from a Special Vehicle Operations Project between Busch Gardens and JLR. (Ex. 6.) Moreover, JLR created a 142-page parts catalog for the Busch Gardens project— something that would simply not be done for a "token use" sale. (*Id.*) And it is undisputed that these DEFENDER vehicles were actually used at Busch Gardens. (Dkt. 127 at 4; Dkt. 102, Ex. J.) In light of these undisputed facts, there is no basis to find JLR's sales were merely token use.

This conclusion is consistent with other situations in which courts have found token use. For example, in *Shelby v. Ford Motor Co.*, 28 U.S.P.Q.2d 1471, 1475 (C.D. Cal. 1993), a case cited by BRP, the court found that Ford had not made bona



fide use of its COBRA mark where Ford made *intracompany* sales to a Canadian affiliate "with the intent to preserve the mark for 'potential' future use in the U.S." In another case, *Mt. Top Bev. Group, Inc. v. Wildlife Brewing N.B., Inc.*, 338 F. Supp. 2d 827, 835 (S.D. Ohio 2003), the court found token use where the registrant's only use in commerce was "a dummy sample of a [liquor] bottle containing liquid that was not the actual [] brew" and no sales of the actual product had been made at the time registrant filed its infringement lawsuit. Here, JLR's sales bear none of the hallmarks of token use—they were made in the regular course of business; they were arms-length transactions to unrelated companies; and they were not made for the mere purpose of maintaining JLR's rights in DEFENDER. The undisputed evidence thus shows that JLR's sales of DEFENDER vehicles were not "token use."

### 3. JLR Always Intended to Resume Use of DEFENDER

Even if BRP could show non-use of DEFENDER for three years, which it cannot, BRP would still have to prove that JLR had no intent to resume use of DEFENDER to prevail on its abandonment claim. (Dkt. 102 at 15.) BRP makes only conclusory arguments regarding intent to resume use. (Dkt. 127 at 8-10.) JLR, however, has produced extensive documentation of its intent to resume use.

As discussed more fully in its brief in support of its motion for summary judgment, JLR has presented evidence that it, for example: continued to support the brand through servicing, parts, and warranty repairs; licensed its DEFENDER mark to third-parties; continued to license franchise dealerships to use the DEFENDER mark; publicly stated its intent to introduce a new DEFENDER model in the U.S.; and displayed concept vehicles for new DEFENDER models in the U.S. (Dkt. 102



at 15-16 and evidence cited therein; Ex. 1.) This evidence clearly evinces JLR's intent to resume use of its mark. *See*, *e.g.*, *FDIC*, 2010 U.S. Dist LEXIS 136392, at *45-46. BRP's attempts to rebut this evidence based on a 30(b)(6) witness' inability to memorize and recall the many documents showing an intent to resume use is insufficient to overcome JLR's evidence of intent to resume use.

BRP cites *Emmpressa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247 (S.D.N.Y. 2002), for the proposition that JLR's evidence is insufficient to show an intent to resume use. (Dkt. 127 at 8-9.) But, the *Emmpressa Cubana* Court found no intent to resume use because the trademark owner was unable to present any evidence beyond self-serving statements and "minor activities" such as internal discussions regarding a potential product (*i.e.*, activities that do "not sufficiently rekindle the public's identification of the mark with the proprietor"). *Emmpressa*, 213 F. Supp. 2d at 270-71. That is simply not the case here.

This case is actually very similar to a case cited in *Emmpressa—Kardex Systems, Inc. v. Sistemco N.V.*, 583 F. Supp. 803, 814-15 (D. Me 1984). In *Kardex*, the plaintiff could not sell goods branded with the mark due to its "straitened business circumstances." *Id.* at 815. But, the plaintiff was able to service and sell parts for already-sold machines. *Id.* at 815-816. And as soon as it was feasible, the plaintiff began developing a new product for sale. *Id.* at 816-17. Under these circumstances, the court held that defendant did not prove abandonment under the "strict evidentiary standard" required. *Id.* at 817. It is impossible to ignore the parallels between *Kardex* and the present case. Like in *Kardex*, JLR was prohibited from selling its DEFENDER vehicle to the general public in the U.S. by



16

circumstances beyond its control. Nevertheless, JLR continued to support the brand through, *inter alia*, servicing vehicles already in the market and providing replacement parts. And as soon as it was feasible to begin selling new DEFENDER vehicles to the public in the U.S., JLR took steps to do so.[12] For the same reasons a finding of abandonment was improper in *Kardex*, it is improper here.

BRP attempts to reinforce its abandonment argument by comparing this case to *General Motors Corp. v. Aristide & Co., Antiquaire de Marques*, 87 U.S.P.Q.2d 1179 (TTAB 2008). (Dkt. 127 at 14-15.) *General Motors* involved the mark LASALLE—a mark GM had stopped using on new vehicles in 1940 (*i.e.*, more than **sixty-five years** before the decision)—a fact that GM admitted. *Id.* at 1182. To avoid abandonment, GM attempted to rely upon part sales. *Id.* But, the TTAB rejected this finding that, while GM was able to produce a license for parts, the license included more than ninety other trademarks, and there was no evidence that any parts were actually produced under the license. *Id.* at 1184. Finally, the TTAB stated that GM had "not submitted any evidence that convinces us that, after a sixty-five year hiatus, it has any serious intent to reintroduce a LASALLE vehicle that was last marketed prior to America's involvement in World War II." *Id.* at 1183. The present case is distinguishable from *General Motors* on nearly every point: (1) JLR never stopped using its DEFENDER mark; (2) JLR has submitted evidence that it continued manufacturing and selling replacement parts for its DEFENDER vehicle; and (3)

---

[12] BRP implies that JLR was obligated to redesign its DEFENDER vehicle as soon as the U.S. laws requiring airbags went into effect. (Dkt. 127 at 8.) Unsurprisingly, BRP does not cite any authority for this proposition.



JLR has submitted evidence of concrete plans to introduce a new DEFENDER vehicle in the U.S. in the near future.  Indeed, contrasting the facts of *General Motors* with the facts of the instant case only reinforces the conclusion that BRP cannot show abandonment—and certainly cannot do so by clear and convincing evidence. JLR is entitled to a finding of ***no abandonment*** as a matter of law.

**B.    Void *Ab Initio***

**1.    BRP's Claim Fails as a Matter of Law**

BRP contends that JLR's DEFENDER registration should be deemed void *ab initio* because JLR allegedly was not using the mark in commerce at the time of its 1999, 2003 and 2014 renewals. In *NetJets Inc. v. IntelliJet Grp., LLC*, 2017 U.S. App. LEXIS 2062 (6th Cir. Feb. 3, 2017), however, the Sixth Circuit unequivocally held that void *ab initio* is ***not*** one of the limited grounds upon which a party can petition to cancel a mark that has been registered on the PTO Principal Register for more than 5 years:

> Under §1064(3), petitions for cancellation of a mark registered for five years may be brought only for a limited set of reasons, including fraudulent registration or if the mark has become generic. *Id.* Void *ab initio*, the basis of IntelliJet Group's claims, is not one of these reasons and §1064 bars its counterclaim for cancellation of the mark.)

2017 U.S. App. LEXIS 2062, at *9. Because JLR's mark has been registered on the Principal Register for 25 years (Dkt. 102, Ex. E), BRP ***cannot*** challenge JLR's registration on the grounds of void *ab initio*.

**2.    BRP's Claim Also Fails on the Merits**

As described above, JLR has used its DEFENDER mark on or in connection



18

with vehicles consistently from 1992 to the present. And as outlined in JLR's own summary judgment motion, BRP's claim that JLR misrepresented its use of the DEFENDER mark in declarations supporting renewal of the DEFENDER registration in 1999, 2003 and 2014 ignores record evidence. (Dkt. 102 at 9-12, 19.)

### a. 1999 and 2003 Renewals

BRP asserts that the November 1999 and October 2003 declarations were deceptive because JLR no longer sold *new* DEFENDER vehicles at either time, and the attached specimens showed pre-1998 model year vehicles. BRP also points to a second DEFENDER application JLR filed in December 1999[13] as further evidence of JLR's supposed deception. BRP's arguments again ignore and omit relevant facts.

As described in JLR's own motion for summary judgment, at the time of the 1999 renewal JLR had only just stopped selling its DEFENDER vehicle, and its dealerships were continuing to sell pre-owned DEFENDER vehicles. (*Id.* at 10.) And at the time of the 2003 renewal JLR had recently sold a fleet of DEFENDER vehicles to Busch Gardens, JLR displayed the DEFENDER CKD concept vehicle at the SEMA show in Las Vegas, and JLR's dealerships were continuing to sell pre-owned DEFENDER vehicles. (*Id.* at 10-11.) Therefore, JLR's 1999 and 2003 declarations of continued use and the attached specimens (showing DEFENDER 90 and 110 vehicles) accurately reflected how JLR was using the mark at both times.

And, as outlined more fully in JLR's motion, even if JLR's specimens were somehow deficient,"[t]he law is settled that the insufficiency of the specimens, per se, does not constitute grounds for cancelling a registration," because the purpose of

---

[13] U.S. Ser. No. 75/861,981 ("the '981 Application). (Ex. 7.)



specimens is not to show *that* a mark is being used in commerce, but rather *how* the mark is being used. *Marshall Field & Co. v. Mrs. Fields Cookies*, 1989 TTAB LEXIS 17, *10-12 (TTAB March 7, 1989).

This is only confirmed by *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 887 (CCPA 1968), a case cited by BRP. In *Morehouse*, the Court declined to cancel a registration based on a defective specimen because the specimen, while defective, was representative of how the trademark owner used the mark, stating "there can be no question that appellee was continuing its use of [the mark] on the same article for which it was initially registered at the time the affidavit was filed and that the allegations of continuing use were true." *Id*.

Finally, with respect to the '981 Application, BRP fails to mention that the application was for *four* classes of goods, only one of which included vehicles. (Ex. 7.) BRP further omits that, for a multi-class application such as the '981 Application, PTO rules permit an applicant to file a "statement of use" only after the mark is in use in commerce "with *all* the goods/services specified" in the application. (Ex. 8, TMEP §1109.03) (emphasis added).[14] Therefore, JLR could not file a statement of use in support of its application until it could demonstrate that the goods in ***all four classes*** were being used in commerce. Consequently, there is no inconsistency in JLR's 1999 and 2003 registration renewals and the December 1999 application and subsequent extension requests.

---

[14] "The applicant may file a statement of use only when the mark has been in use in commerce on or in connection with all the goods/services specified in the notice of allowance, unless the applicant files a request to divide for those goods/services not yet in use in commerce." (Ex. 8, TMEP §1109.03.)



20

### b.    2014 Renewal

BRP suggests that the 2014 renewal should be deemed void because the specimen attached to JLR's declaration depicted a pre-owned vehicle sold by an unrelated, third-party car dealer, CNC Motors. (Dkt. 127 at 19-20.)  Yet BRP has not identified any misrepresentation by JLR in its PTO statements. In fact, BRP does not and cannot deny that JLR's specimen accurately reflects JLR's use of the DEFENDER mark at the time in connection with vehicles, particularly since BRP *does not dispute* that in 2014 JLR sold new DEFENDER vehicles to Rovers North and JLR dealerships sold pre-owned DEFENDER vehicles.

Regarding the source of the vehicle depicted in the specimen, it is irrelevant. JLR does not rely on CNC Motors' sale of the depicted vehicle to establish use in commerce in 2014, but instead relies on new vehicle sales to Rovers North and pre-owned vehicle sales by its dealerships.  Because JLR was selling new and pre-owned DEFENDER vehicles like that shown in its specimen in U.S. commerce in 2014, JLR's declaration was true. *See Morehouse Mfg. Corp.*, 407 F.2d at 887.[15]

For all these reasons, BRP's motion for summary judgment on its counterclaim of void *ab initio* should be denied.

## C.    Damages

---

[15] It is also irrelevant whether JLR's declarant (JLR North America's general counsel Anna-Lisa Corrales) knew about JLR's sales to Rovers North when she executed the 2014 renewal declaration on JLR's behalf. Indeed, BRP cites no authority that the personal knowledge of any declarant is relevant to the Court's inquiry when, as here, there is unrefuted evidence of use. And BRP's argument that JLR's refusal to respond to improper requests for admission constituted an admission that Ms. Corrales did not know about these sales is unsupported by fact or law (and, in any event, is irrelevant to the Court's analysis).



Under the Lanham Act, subject only to the principles of equity, a prevailing plaintiff "shall be entitled" to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. §1117(a). BRP asks the Court to find as a matter of law that JLR is not entitled to damages. There is no basis for BRP's request.

### 1.    JLR's Lost Sales

JLR does not intend to seek "lost sales" damages. So, whether JLR is entitled to recover such damages is not before the Court.

### 2.    Disgorgement of BRP's Profits

"[A]n award of profits may be warranted under various rationales, such as unjust enrichment, deterrence, and compensation." *Laukus v. Rio Brands, Inc.*, 391 Fed. Appx. 416, 424 (6th Cir. 2010). The Court must balance the equities in determining whether an award of profits is appropriate, including: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Id*.

A trademark owner is not, however, required to prove that all, or even most, of these factors weigh in its favor. *Id*. (reversing district court denial of profits although the trademark owner identified a genuine issue of material fact on only two of the factors). Nor is the trademark owner required to prove bad faith, willfulness, or that the parties directly compete. *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 607 (6th Cir. 1991); *Lucky's Detroit, LLC v. Double L, Inc.*, No. 09-14622,



2014 U.S. Dist. LEXIS 137588, at *4 (E.D. Mich. Sept. 30, 2014). And the Court *must* be mindful that *"[t]he trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." Wynn Oil Co.*, 943 F.2d at 606-7 (emphasis added). *See also Lucky's*, 2014 U.S. Dist. LEXIS 137588, at *5.

Here, there is ample evidence BRP adopted its DEFENDER mark with the intent to deceive:

- BRP adopted the *identical* trademark for use with closely related goods that BRP markets to the same type of customer using the same advertising imagery JLR has employed around the world for 70 years.

- BRP's attempts to register car and SUV names for its products have been repeatedly rejected by the PTO, leading BRP to attempt to obtain consent from the car manufacturers to use the names. (Exs. 9, 10)

- In at least some instances, car manufacturers have refused to allow BRP to use car names due to a likelihood of confusion (for example, ███████████████████████████████). (Ex. 11.)

- █████████████████████████████████████████
  █████████████████████████████████ (Ex. 12.)

- JLR put BRP on notice of its use and registration of DEFENDER and objected to BRP's use of the mark at least five months before BRP began selling its vehicle. (Ex. 13.)

This evidence presents questions of fact as to whether disgorgement is warranted.

Further, injunctive relief is inadequate in this case given that it would not redress the harm caused by BRP's infringement to date, and because BRP ███████ ████████████████ from its infringement. *See Playboy Enter. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982) (disgorgement is particularly appropriate to deter and avoid unjust enrichment where the infringer has "yielded great financial reward"); *United States Soo Bahk Do Moo Duk Kwan Fed'n, Inc. v. Tang Soo Karate Sch., Inc.*, No. 3:12-CV-00669, 2015 U.S. Dist. LEXIS 107955, *88-89 (M.D. Pa.



23

Aug. 17, 2015) (injunctive relief inadequate in part because the infringer would be allowed to use the mark for years with no consequence other than restraint on future use). Courts further reason that if the infringer is only taxed a nominal portion of its profits, the cost of infringement becomes nothing more than a line-item factored into the infringer's profit and loss statement. *Playboy Enter.*, 692 F.2d at 1275. Here, to date, ███████████████████████████████████████████████████ ██████████████████. (Exs. 14, 15.) Requiring BRP to relinquish all its ill-gotten gains is the only way to make BRP's infringement unprofitable, deter future infringement, and ensure that BRP is not unjustly enriched from its misconduct.[16]

There is no merit to BRP's claim that JLR unreasonably delayed in filing suit. JLR filed an Opposition to BRP's application to register the DEFENDER mark at the first opportunity in August 2015.[17] (Ex. 16.) And JLR filed this action when it became clear settlement was not possible.

Lastly, courts reject BRP's claim that the public has no interest in making its

---

[16] To the extent BRP relies on *Balance Dynamics Corp. v. Schmitt Ind.*, 204 F.3d 683, 695 (6th Cir. 2000), for the proposition that disgorgement amounts to an improper penalty absent proof of quantifiable harm to the trademark owner, BRP's reliance is misplaced. The *Balance Dynamics* Court upheld the magistrate's finding that disgorgement would be an improper penalty for *false advertising* because there was no evidence of either harm to the plaintiff or benefit to the defendant. That is not the case here. Moreover, the *Balance Dynamics* Court distinguished false advertising claims from trademark infringement, noting that disgorgement is appropriate to redress trademark infringement under the deterrence theory where, as here, the defendant has benefited directly from its wrongful conduct. *Id.* at 695 n.6.

[17] A party may not file an Opposition to a pending trademark application until the PTO issues a Notice of Allowance, indicating that the PTO has approved the application for publication (subject to third-party objections). 15 U.S.C. §1063(a).



misconduct unprofitable. *See Playboy Enter.*, 692 F.2d at 1275 (public has interest in removing economic incentive from infringement because of reliance on marks as indicator of quality); *United States Soo Bahk Do Moo Duk Kwan Fed'n*, 2015 U.S. Dist. LEXIS 107955 at *87-88 (there is a public interest in eliminating consumer confusion). Indeed, consumers rely on familiar trademarks to identify trusted brands and locate products associated with certain qualities. *See Playboy Enter.*, 692 F.2d at 1275 ("Many consumers are willing to pay substantial premiums for particular items which bear famous trademarks based on their belief that such items are of the same high quality as is traditionally associated with the trademark owner."). Additionally, in this case, the likelihood of consumer confusion will undoubtedly increase exponentially as JLR ramps up its DEFENDER marketing in the coming months ahead of and after the launch of its redesigned DEFENDER vehicle.

For all these reasons, there is at least a question of fact as to whether JLR is entitled to recover the profits BRP earned from infringing the DEFENDER mark.

## IV.   CONCLUSION

For the foregoing reasons, JLR respectfully requests that the Court deny BRP's Motion for Summary Judgment in its entirety.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

Dated: <u>August 8, 2018</u>

<u> /s/ Chanille Carswell </u>
Frank A. Angileri (P45611)
Chanille Carswell (P53754)
Rebecca J. Cantor (P76826)
Alan J. Gocha (P80972)
1000 Town Center, Twenty-Second Floor



25

Southfield, Michigan 48075
Tel: (248) 358-4400 / Fax: (248) 358-3351
Email:  fangileri@brookskushman.com
         ccarwell@brookskushman.com
         agocha@brookskushman.com
         rcantor@brookskushman.com

*Attorneys for Plaintiff*
*Jaguar Land Rover Limited*

